**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | | |
|---|---|---|
| ZYKERRIA TYCHUN BOWLES, | : | |
| | : | |
| PLAINTIFF, | : | CIVIL ACTION NO: |
| | : | |
| V. | : | |
| | : | JURY TRIAL DEMANDED |
| DONAVON E. SCOTT-SINCLAIR; | : | |
| CYANN DRACOS JONES; and | : | |
| RAYMOND G. COUCH | : | |
| | : | |
| DEFENDANTS. | : | |

## **COMPLAINT**

1.     Plaintiff brings this civil action pursuant to 42 U.S.C. § 1983 for violations of

the rights and privileges afforded by the First, Fourth, and Fourteenth Amendments

to the United States Constitution, when, acting under color of law and without a

warrant or probable cause or even arguable probable cause, Plaintiff's person was

unlawfully seized using excessive force and caused her to be arrested without lawful

justification.

2.     In seizing Plaintiff's person and using excessive force against her, Defendants

Donavon E. Scott-Sinclair and Cyann Jones violated Plaintiff's Fourth Amendment

right to be free from excessive force.

3.     In retaliating against Plaintiff for engaging in verbal expression protected by

the First Amendment to the United States Constitution, Defendants Scott-Sinclair

and Jones violated Plaintiff's right to freedom of speech.

4.    Raymond G. Couch, as the Chief of Police of the Manchester Police Department, failed to have in place and failed to enforce policies and procedures that would have prevented Defendants Scott-Sinclair and Cyann Jones from violating the constitutional rights of Plaintiff.

5.    Defendant Couch, as the Chief of Police of the Manchester Police Department, knowingly hired Defendant Scott-Sinclair despite his documented history of prior excessive and improper use of force incidents and a prior law enforcement lawsuit, and thereby created the conditions for the violation of Plaintiff's constitutional rights.

## PARTIES, JURISDICTION, AND VENUE

6.    Plaintiff Zykerria Tychun Bowles is a citizen and resident of Manchester, Georgia.

7.    Defendant Donavon E. Scott-Sinclair is a citizen and resident of Georgia.

8.    At all times relevant to this Complaint, Defendant Scott-Sinclair was an officer of the Manchester Police Department acting under color of law.

9.    Plaintiff sues Defendant Scott-Sinclair in his individual capacity.

10.    Defendant Scott-Sinclair is subject to the jurisdiction of this Court.

11.    Defendant Cyann Dracos Jones is a citizen and resident of Georgia.

12.    At all times relevant to this Complaint, Defendant Jones was an officer of the

Manchester Police Department acting under color of law.

13.    Plaintiff sues Defendant Jones in his individual capacity.

14.    Defendant Jones is subject to the jurisdiction of this Court.

15.    Defendant Raymond G. Couch is a citizen and resident of Georgia.

16.    At all times relevant to this Complaint, Defendant Couch was the Chief of Police of the Manchester Police Department acting under color of law.

17.    At all times relevant to this Complaint, Defendant Couch was the chief law enforcement officer for the Manchester Police Department ("MPD") and was responsible for the hiring, training, supervision, and retention of officers, including Defendants Scott-Sinclair and Jones.

18.    Plaintiff sues Defendant Couch in his individual capacity.

19.    Defendant Couch is subject to the jurisdiction of this Court.

20.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because this civil action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and a substantial part of the events giving rise to Plaintiff's claims occurred in this district, specifically in Manchester, Georgia.

## FACTS

*Defendant Scott-Sinclair's Background and History of Misconduct*

22.     Before being hired by MPD, Defendant Scott-Sinclair had worked as a law enforcement officer at multiple agencies in Georgia and had a history of violence and poor performance.

23.     For example, in 2018, as an Officer for the Fort Valley, Georgia, Police Department, Defendant Scott-Sinclair unconstitutionally arrested a journalist in retaliation for filming in public.

24.     During that arrest, Defendant Scott-Sinclair turned off his body camera prior to completing the arrest and utilizing force against the journalist.

25.     Following that First Amendment retaliation, Defendant Scott-Sinclair was fired from the Fort Valley Police Department.

26.     Following the incident at the Fort Valley Police Department, POST (the commission on Peace Officer Standards and Training) placed Defendant Scott-Sinclair on probation instead of revoking his police certification.

27.     Following the incident at the Fort Valley Police Department, and in order to avoid revocation of his police certification from POST, Defendant Scott-Sinclair underwent training in anger management, use of force procedure, and arrest procedure, at his own expense.

28.     Fort Valley Police Department fired Defendant Scott-Sinclair on October 19,

2018.

29.     Following his termination from the Fort Valley Police Department, Defendant Scott-Sinclair began working in January 2019 as a Peace Officer for the Montezuma, Georgia, Police Department, and he voluntarily resigned after only four months.

30.     Defendant Scott-Sinclair's employment at the Montezuma Police Department did not outlast the customary one-year probationary period.

31.     Following his voluntary resignation from the Montezuma Police Department, Defendant Scott-Sinclair began working in May 2019 for the Marshallville, Georgia, Police Department, and he voluntarily resigned eight months later.

32.     Defendant Scott-Sinclair's employment for the Marshallville Police Department did not outlast the customary one-year probationary period.

33.     In June 2020, while Scott-Sinclair was working in Bibb County, Georgia, as a private security guard for a nightclub, he got into an argument with an off-duty 911 dispatcher.

34.     Witnesses to the events believed the argument between Scott-Sinclair and the 911 dispatcher could have been and should have been non-violently de-escalated.

35.     Instead, Scott-Sinclair followed the dispatcher to the nightclub parking lot, concealed a firearm behind his back, and shot and killed the dispatcher.

36.     Scott-Sinclair was charged with murder for killing the dispatcher.

37.     At the time, Scott-Sinclair's father was a captain for the Bibb County Sheriff's

office.

38.    On April 26, 2022, Scott-Sinclair's murder charge was presented to a grand jury, which returned a "no bill," and charges against Scott-Sinclair were dropped.

39.    After the charges against him were dropped, Defendant Scott-Sinclair worked, in July 2022, as a Deputy Sheriff in the Talbot County Sheriff's Office, and he voluntarily resigned six months later.

40.    Defendant Scott-Sinclair's tenure in the Talbot County Sheriff's Office did not outlast the customary probationary period.

41.    Overlapping with his time in the Talbot County Sheriff's Office, Defendant Scott-Sinclair also worked in the Talbotton Police Department from August 2022 until he resigned ten months later, before he completed the customary one-year probationary period.

42.    Prior to Defendant Scott-Sinclair's employment with the Manchester Police Department, he worked for five different law enforcement offices in Georgia and he had not lasted through the probationary period in any of them.

43.    Prior to Defendant Scott-Sinclair's employment with the Manchester Police Department, he had been charged with murder after failing to deescalate an altercation while working as a private security guard.

44.    In the five years preceding his employment with the Manchester Police Department, Defendant Scott-Sinclair's POST certification had been on

probationary status for two years.

45.    Prior to his employment with MPD, minimal investigation into Defendant Scott-Sinclair would have revealed, at least, (1) prior incidents of unconstitutional retaliation for protected activities; (2) repeated prior incidents of unauthorized, unreasonable, and personal, uses of force; (3) repeated prior incidents of deliberate failure to engage his body camera during altercations in order to avoid consequences for constitutional violations; and (4) repeated incidents of escalation of force in retaliation for protected activities.

46.    While he worked as a law enforcement officer with MPD, including prior to October 18, 2023, Defendant Scott-Sinclair regularly retaliated against individuals within MPD jurisdiction for engaging in speech and other protected conduct.

47.    While he worked as a law enforcement officer with MPD, including prior to October 18, 2023, Defendant Scott-Sinclair regularly used excessive force against individuals within MPD jurisdiction.

48.    While he worked as a law enforcement officer with MPD, including prior to October 18, 2023, Defendant Scott-Sinclair's routine retaliations and uses of excessive force were so well known in the community that he was described as "provoking" citizens to create pretexts for retaliation, arrest, and use of force.

49.    For example, while he worked as a law enforcement officer with MPD, including prior to October 18, 2023, Defendant Scott-Sinclair engaged in a

widespread and commonly-known custom of retaliating against citizens—primarily black citizens—for what the citizens said, using excessive force upon them, and arresting them for bogus (or entrapped) charges of disorderly conduct and/or obstruction.

50. In some months prior to October 18, 2023, Defendant Scott-Sinclair engaged in unlawful retaliation and excessive force against approximately twenty to thirty individuals per month.

51. On October 18, 2023—a mere seven months before the incident giving rise to this Complaint—Defendant Scott-Sinclair engaged in another act of First Amendment retaliation and excessive force while employed as an officer with MPD and acting under color of law.

52. On that date, Defendant Scott-Sinclair conducted a traffic stop on Nebula Road in Meriwether County, Georgia, directly in front of the home of Kevin Langie, a United States Marine Corps veteran.

53. The driver Defendant Scott-Sinclair stopped was Mr. Langie's nephew, and the stated basis for the stop was a suspected window-tint violation, which is an equipment violation, not a moving violation.

54. Mr. Langie walked into his own front yard and began recording the traffic stop using a tablet device, and he verbally questioned Defendant Scott-Sinclair's conduct.

55.    When Defendant Scott-Sinclair began putting on tactical gloves, Mr. Langie protested and invoked his First Amendment right to freedom of speech.

56.    Defendant Scott-Sinclair warned Mr. Langie that he would arrest him for disorderly conduct if Mr. Langie cursed again.

57.    After Mr. Langie cursed while standing on his own property, Defendant Scott-Sinclair abandoned the traffic stop, ran across Nebula Road onto Mr. Langie's property, and tackled him to the ground.

58.    Defendant Scott-Sinclair later described his own use of force by stating that he "tackled the shit out of him."

59.    At the time Defendant Scott-Sinclair tackled him, Mr. Langie was unarmed, was standing on his own property, and had not threatened Defendant Scott-Sinclair or any other person.

60.    Defendant Scott-Sinclair and another MPD officer then arrested Mr. Langie and seized and damaged his personal property, including his tablet, without a warrant, probable cause, or reasonable articulable suspicion.

61.    Defendant Scott-Sinclair caused Mr. Langie to be charged with obstruction and disorderly conduct based on conduct—cursing and recording a traffic stop—that was protected by the First Amendment.

62.    When Mr. Langie asked how he could be arrested for his speech and for filming a traffic stop, Defendant Scott-Sinclair responded, "Yeah—we don't do that

constitution stuff down here."

63.    The October 18, 2023 arrest and use of force against Mr. Langie was one of numerous instances in which Defendant Scott-Sinclair retaliated against citizens for protected speech and recording, and used excessive force against them, before he encountered Plaintiff Bowles on June 10, 2024.

*The June 10, 2024 Incident*

64.    On June 10, 2024, Defendant Scott-Sinclair was an officer with MPD acting under color of law.

65.    On June 10, 2024, Defendant Cyann Jones was an officer with the MPD acting under color of law.

66.    On June 10, 2024, at approximately 6:21 p.m., Defendant Scott-Sinclair, initiated a traffic stop against a gray Ford Escape.

67.    In his police report, Defendant Scott-Sinclair justified this traffic stop by claiming that he "OBSERVED A FRONT SEAT PASSENGER…THAT WAS NOT RESTRAINED IN A SEAT BELT."

68.    Before approaching the vehicle, Defendant Scott-Sinclair failed to activate his body worn camera but activated it during the encounter.

69.    During the traffic stop, Defendant Scott-Sinclair asked the name of all passengers.

70.    Plaintiff, the front seat passenger, gave Defendant Scott-Sinclair her correct

name, Zykerria Bowles.

71.    Defendant Scott-Sinclair arrested passenger Ms. Hampton for providing an incorrect name.

72.    When Defendant Jones arrived at the scene, Plaintiff Bowles and Ms. Wenzel, the driver, were in the car.

73.    Defendant Jones asked Plaintiff Bowles and Ms. Wenzel to step out of the vehicle and conducted a pat-down of both to confirm that neither had any hidden weapons.

74.    The pat-downs found no weapons.

75.    The pat-downs were a violation of Plaintiff Bowles' and Ms. Wenzel's constitutional rights as a failure to wear a seat bel does not authorize a *Terry* pat-down. *State v. Robusto*, 348 Ga. App. 579 (2019).

76.    Plaintiff Bowles and Ms. Wenzel exited the vehicle only because they were required to in violation of their constitutional rights.

77.    Plaintiff Bowles verbally protested the arrest of Ms. Hampton, questioning the legality of Ms. Hampton's arrest and stating, "I know my rights."

78.    Rather than continuing to focus on the arrest of Ms. Hampton, Defendant Scott-Sinclair left his vehicle and actively taunted Plaintiff Bowles, demanding, "What's the Fourth Amendment, since you know your rights?"

79.    When Plaintiff Bowles did not immediately respond, Defendant Scott-Sinclair

quipped, "exactly."

80. Defendant Scott-Sinclair then engaged in a back-and-forth with Plaintiff Bowles regarding her rights, concluding with Plaintiff's statement that the officers "don't know how to do your jobs."

81. Defendant Scott-Sinclair continued taunting Plaintiff Bowles, stating: "you can file a complaint today, tomorrow, and the next day, I'll bet you I'll be here tomorrow. And the next day. 'cause I know the law."

82. Defendant Scott-Sinclair then escalated from taunting to threatening, warning Plaintiff Bowles: "you call me out my name again and you gonna go to jail too, you understand that?"

83. Plaintiff Bowles responded, "I can do that...freedom of speech."

84. Defendant Scott-Sinclair replied, "no you cannot."

85. Plaintiff then said, "if you can't take it, then don't be a police officer."

86. To this, Defendant Scott-Sinclair replied, "if I can't take it, you gonna go to jail that's what's gonna happen."

87. Defendant Scott-Sinclair further demanded that Plaintiff address him as "sir" and asserted—incorrectly—that her using the word "nigga" constituted "fighting words" under the law.

88. Both Plaintiff Bowles and Defendant Scott-Sinclair are African American.

89. At this point, Defendant Scott-Sinclair was clearly irritated at Plaintiff

Bowles.

90. Defendant Scott-Sinclair, whose only probable cause was the stop for failure to wear a seatbelt, then searched the vehicle and located a blue plastic container, sniffed its contents, and muttered to himself, "gotcha" while walking swiftly toward Plaintiff Bowles.

91. Defendant Scott-Sinclair had no reason to suspect that the blue container or any of the items in the vehicle belonged to Plaintiff Bowles as it was just as likely that any of the other occupants of the vehicle owned the items found therein.

92. Defendant Scott-Sinclair then flippantly discarded the blue container and approached Plaintiff Bowles demanding that she stand up.

93. Defendant Scott-Sinclair did not tell Plaintiff Bowles that she was under arrest or that she was being detained for any reason: he said only to stand up.

94. Defendant Scott-Sinclair did not give Plaintiff Bowles an opportunity to stand up and grabbed her using excessive force without cause.

95. Upon seeing Defendant Scott-Sinclair's initial use of force, Defendant Jones instantly joined in on the excessive use of force.

96. As Defendant Scott-Sinclair and Defendant Jones manhandled Plaintiff Bowles, Defendant Scott-Sinclair deployed his department-issued taser weapon against Plaintiff and delivered an electrical discharge.

97. Defendant Cyann Jones also deployed his department-issued taser and

delivered an electrical discharge.

98.    Before the officers used force against Plaintiff and discharged their tasers, the pat-down conducted by Defendant Cyann Jones had already confirmed that Plaintiff was unarmed and had no weapons.

99.    Plaintiff sustained cuts, scrapes, bruises, terror, burns, electric shock, and violation as a result of the encounter.

100.    Defendant Scott-Sinclair threatened Plaintiff with incarceration if she continued her verbal assertion of her rights and criticism of law enforcement.

101.    At no time during the encounter did Plaintiff's verbal expressions constitute conduct that posed a threat to the physical safety of any person.

102.    MPD's use of force policy, as reflected in its training materials, states that force shall end immediately once a suspect no longer poses a threat.

**Count One: 42 U.S.C. § 1983 — Unreasonable Seizure**
**Against Defendant Scott-Sinclair**

103.    Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

104.    Plaintiff brings Count One against Defendant Scott-Sinclair in his individual capacity for violations of her rights secured by the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

105.    At all relevant times during his interactions with Plaintiff on June 10, 2024, Defendant Scott-Sinclair was an officer with MPD acting under color of law.

106.    On June 10, 2024, Defendant Scott-Sinclair arrested Plaintiff without

probable cause, reasonable articulable suspicion, or a warrant, all in violation of Plaintiff's Fourth Amendment rights.

107. Defendant Scott-Sinclair seized Plaintiff even though Plaintiff had not violated any laws or committed any crime prior to the seizure that would justify the manner in which she was seized.

108. During this unlawful arrest, Defendant Scott-Sinclair seized Plaintiff without a warrant, consent, or exigent circumstances, violating Plaintiff's Fourth and Fourteenth Amendment rights against unreasonable searches and seizures

109. At all times during Defendant Scott-Sinclair's June 10, 2024 unlawful arrest and seizure of Plaintiff Defendant Scott-Sinclair knew he lacked probable cause, reasonable articulable suspicion, or a warrant to do so.

110. Any reasonable officer on June 10, 2024, would have known that Defendant Scott-Sinclair lacked a warrant, probable cause, or reasonable articulable suspicion to arrest Plaintiff and to seize her person.

111. Defendant Scott-Sinclair conducted the unlawful arrest and seizure of Plaintiff under the color of state law, while he was acting in his capacity as a law enforcement officer.

112. At the time Defendant Scott-Sinclair seized Plaintiff, Defendant Cyann Jones had already conducted a pat-down of Plaintiff and confirmed she had no weapons.

113. Defendant Scott-Sinclair seized Plaintiff even though Plaintiff did not pose

any threat to the safety of any person at the time of the seizure.

114. Defendant Scott-Sinclair seized Plaintiff even though he had no probable cause or arguable probable cause to believe that Plaintiff had committed any crime or violated any law justifying the use of force.

115. Defendant Scott-Sinclair seized Plaintiff even though he had no reasonable articulable suspicion sufficient to justify the forcible seizure of Plaintiff.

116. No reasonable officer in Defendant Scott-Sinclair's position would have believed there was any legal reason to seize Plaintiff in the manner he did.

117. Defendant Scott-Sinclair's seizure of Plaintiff violated her Fourth Amendment constitutional rights.

118. Defendant Scott-Sinclair's seizure of Plaintiff was a proximate cause of personal injuries and other damages to Plaintiff.

### Count Two: 42 U.S.C. § 1983 — Excessive Use of Force Against Defendant Scott-Sinclair

119. Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

120. Plaintiff brings Count Two against Defendant Scott-Sinclair in his individual capacity pursuant to 42 U.S.C. § 1983.

121. On June 10, 2024, Defendant Scott-Sinclair was an officer with MPD acting under color of law.

122. It was clearly established on June 10, 2024, and it had been for decades, that a law enforcement officer's use of excessive force during an arrest violated constitutional rights.

123. It was clearly established on June 10, 2024, and it had been for decades, that law enforcement officers must not use any more physical force than necessary against an individual during an arrest.

124. It was clearly established on June 10, 2024, and it had been for decades, that no amount of force used by an officer against a citizen is reasonable when it is used to effectuate an unlawful arrest.

125. Defendant Scott-Sinclair's arrest of Plaintiff on June 10, 2024, was unlawful and unjustified.

126. Defendant Scott-Sinclair used more force than was necessary under the circumstances when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her.

127. Prior to Defendant Scott-Sinclair's use of force, Defendant Cyann Jones had personally conducted a pat-down of Plaintiff and confirmed that Plaintiff was unarmed and had no weapons.

128. At no time on June 10, 2024, did Plaintiff present any physical threat of harm to anyone that would authorize the force Defendant Scott-Sinclair used.

129. Defendant Scott-Sinclair unlawfully and excessively grabbed Plaintiff,

wrestled her to the ground, and deployed a taser against her.

130.   At no time on June 10, 2024, was this use of force authorized or justified.

131.   Defendant Scott-Sinclair's use of force against Plaintiff was excessive.

132.   Defendant Scott-Sinclair's use of force against Plaintiff was not reasonable.

133.   No reasonable officer in Defendant Scott-Sinclair's position would have believed that the use of force that Defendant Scott-Sinclair used against Plaintiff Bowles was reasonable, necessary, or lawful.

134.   Defendant Scott-Sinclair knew he was using more force than was necessary under the circumstances when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her on June 10, 2024.

135.   Defendant Scott-Sinclair knew he was using more force than was necessary for any legitimate law enforcement purpose when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her on June 10, 2024.

136.   Each of Defendant Scott-Sinclair's uses of force against Plaintiff on June 10, 2024, were unreasonable, both individually and collectively.

137.   Defendant Scott-Sinclair knew that each of his uses of force against Plaintiff on June 10, 2024, were unreasonable, both individually and collectively.

138.   Defendant Scott-Sinclair's uses of force on June 10, 2024, as alleged in this Complaint on Plaintiff were subjectively unreasonable.

139. Defendant Scott-Sinclair's use of force on June 10, 2024, as alleged in this Complaint on Plaintiff was objectively unreasonable.

140. Defendant Scott-Sinclair's use of force against Plaintiff violated her Fourth Amendment constitutional rights.

141. Defendant Scott-Sinclair's use of force against Plaintiff was a proximate cause of personal injuries and other damages to Plaintiff.

### Count Three: 42 U.S.C. § 1983 — Excessive Use of Force Against Defendant Cyann Jones

142. Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

143. Plaintiff brings Count Three against Defendant Cyann Jones in his individual capacity pursuant to 42 U.S.C. § 1983.

144. On June 10, 2024, Defendant Cyann Jones was an officer with MPD acting under color of law.

145. It was clearly established on June 10, 2024, and it had been for decades, that a law enforcement officer's use of excessive force during an arrest violated constitutional rights.

146. It was clearly established on June 10, 2024, and it had been for decades, that law enforcement officers must not use any more physical force than necessary against an individual during an arrest.

147. It was clearly established on June 10, 2024, and it had been for decades, that no amount of force used by an officer against a citizen is reasonable when it is used

to effectuate an unlawful arrest.

148. The arrest of Plaintiff on June 10, 2024, was unlawful and unjustified.

149. Defendant Jones used more force than was necessary under the circumstances when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her.

150. Prior to deploying his use of force against Plaintiff, Defendant Cyann Jones had personally conducted a pat-down of Plaintiff and confirmed that Plaintiff was unarmed and had no weapons.

151. Despite knowing that Plaintiff was unarmed and had no weapons, Defendant Cyann Jones deployed his department-issued taser against Plaintiff.

152. Despite knowing that Plaintiff was unarmed and had no weapons, Defendant Cyann Jones assisted Defendant Scott-Sinclair in wrestling Plaintiff to the ground.

153. At no time on June 10, 2024, did Plaintiff present any physical threat of harm to anyone that would authorize Defendant Jones' use of force against her.

154. At no time on June 10, 2024, was Defendant Jones' use of force against Plaintiff authorized or justified.

155. Defendant Jones' use of force against Plaintiff was excessive.

156. Defendant Jones' use of force against Plaintiff was not reasonable.

157. No reasonable officer in Defendant Jones' position, having just confirmed that a suspect was unarmed, would have believed that Defendant Jones' use of force was

reasonable, necessary, or lawful.

158.    Defendant Jones knew he was using more force than was necessary under the circumstances when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her on June 10, 2024.

159.    Defendant Jones knew he was using more force than was necessary for any legitimate law enforcement purpose when he unlawfully and excessively grabbed Plaintiff, wrestled her to the ground, and deployed a taser against her on June 10, 2024.

160.    Each of Defendant Jones' uses of force against Plaintiff on June 10, 2024, were unreasonable, both individually and collectively.

161.    Defendant Jones knew that each of his uses of force against Plaintiff on June 10, 2024, were unreasonable, both individually and collectively.

162.    Defendant Jones' uses of force on June 10, 2024, as alleged in this Complaint on Plaintiff were subjectively unreasonable.

163.    Defendant Jones' use of force on June 10, 2024, as alleged in this Complaint on Plaintiff was objectively unreasonable.

164.    Defendant Jones' use of force against Plaintiff violated her Fourth Amendment constitutional rights.

165.    Defendant Jones' use of force against Plaintiff was a proximate cause of personal injuries and other damages to Plaintiff.

**Count Four: 42 U.S.C. § 1983 — Retaliation for Exercise of First Amendment Right to Freedom of Speech Against Defendant Scott-Sinclair**

166.   Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

167.   Plaintiff brings Count Four against Defendant Scott-Sinclair in his individual capacity for violations of rights secured by the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

168.   Defendant Scott-Sinclair tackled, seized, used force upon, and arrested Plaintiff because of what she said.

169.   At all times relevant to this Complaint, Defendant Scott-Sinclair was an officer with MPD acting under color of state law.

170.   The First Amendment to the United States Constitution protects the right of individuals to oppose or challenge police action.

171.   It is, and has been for decades, clearly established law that an individual's "freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (internal quotation omitted).

172.   It is, and has been for decades, clearly established law that "the First Amendment [to the United States Constitution] protects a significant amount of

verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987).

173. It is, and has been for decades, clearly established law that the First Amendment to the United States Constitution prohibits state and local governments, as well as individuals acting under color of law, from "punish[ing] only spoken words" that are not "fighting words." *Lewis v. City of New Orleans*, 415 U.S. 130 (1974).

174. All of Plaintiff's speech to Defendant Scott-Sinclair was protected under the First Amendment.

175. On June 10, 2024, Plaintiff engaged in constitutionally protected expression when she protested and challenged the conduct of Defendant Scott-Sinclair.

176. Plaintiff's expression did not constitute conduct that posed a physical threat to Defendant Scott-Sinclair or any other person.

177. Plaintiff's expression did not constitute a lawful basis for arrest, detention, or the use of force.

178. Defendant Scott-Sinclair threatened Plaintiff with incarceration if she continued her expression.

179. Defendant Scott-Sinclair followed through on his unlawful and unconstitutional threat by arresting her because she criticized and challenged his actions.

180. Defendant Scott-Sinclair's use of force and arrest against Plaintiff constituted adverse action that would chill a person of ordinary firmness from continuing to exercise First Amendment rights.

181. There is a direct causal connection between Plaintiff's verbal expression and Defendant Scott-Sinclair's use of force and arrest of Plaintiff.

182. For example, immediately preceding Defendant Scott-Sinclair's illegal arrest of Plaintiff, Defendant Scott-Sinclair threatened Plaintiff with incarceration if she continued her verbal assertion of her rights and criticism of law enforcement.

183. Given Defendant Scott-Sinclair's training and experience as a law enforcement professional, he knew that his arrest of Plaintiff, as alleged in this Complaint, on June 10, 2024, violated the First Amendment of the United States Constitution.

184. Defendant Scott-Sinclair's actions in arresting Plaintiff were adverse and punitive, as he knew or had reason to know that these actions would deter Plaintiff from continuing to engage in protected speech.

185. Defendant Scott-Sinclair's actions in arresting Plaintiff were directly caused by Plaintiff's exercising her rights engage in protected speech, and through no other act or omission of Plaintiff's.

186. Defendant Scott-Sinclair knew, and any reasonable officer would know, based upon education, training, and experience, that Plaintiff's June 10, 2024, arrest

violated her First Amendment rights.

187. Plaintiff engaged in protected speech including, by way of example, informing Defendant Scott-Sinclair of the First Amendment protected status of her speech.

188. No reasonable officer in Defendant Scott-Sinclair's position would have believed that using force against Plaintiff for engaging in protected expression and arresting her because of that expression was constitutionally permissible.

189. Defendant Scott-Sinclair's retaliation against Plaintiff for exercising her First Amendment right to freedom of speech violated the First Amendment to the United States Constitution.

190. Defendant Scott-Sinclair's retaliation against Plaintiff for exercising her First Amendment rights was a proximate cause of personal injuries and other damages to Plaintiff.

191. Defendant Scott-Sinclair intentionally violated Plaintiff's First Amendment rights by unlawful arrest, entitling Plaintiff to punitive damages.

### Count Five: 42 U.S.C. § 1983 — Failure to Intervene
### Against Defendant Jones

192. Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

193. Plaintiff asserts Count Five against Defendant Jones in his individual capacity.

194.   Defendant Jones was aware on June 10, 2024, that Defendant Scott-Sinclair's arrest of Plaintiff, seizure of Plaintiff, and use of force against Plaintiff was both unlawful and unconstitutional.

195.   Despite his awareness of Defendant Scott-Sinclair's unconstitutional conduct against Plaintiff, on June 10, 2024, Defendant Jones failed to intervene in any way to halt or prevent Defendant Scott-Sinclair's unlawful and unconstitutional conduct.

196.   Defendant Jones could have intervened and stopped Defendant Scott-Sinclair from unconstitutional seizure, use of force, and retaliation against Plaintiff for her protected conduct, but he deliberately failed to do so.

197.   Defendant Jones' failure to intervene to stop Defendant Scott-Sinclair's unconstitutional seizure, use of force, and retaliation against Plaintiff for her protected conduct caused injury to Plaintiff and deprived Plaintiff of his constitutional rights.

### Count Six: 42 U.S.C. § 1983 — Supervisory Liability<br>Against Defendant Couch

198.   Plaintiff incorporates paragraphs 1–102 as if fully realleged herein.

199.   Plaintiff brings Count Six against Defendant Couch in his individual capacity pursuant to 42 U.S.C. § 1983.

200.   Plaintiff alleges Count Six pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments.

201.   At all times relevant to this Complaint, Defendant Couch was the Chief of

Police of MPD acting under color of law.

202. At all times relevant to this Complaint, Defendant Couch was the chief law enforcement officer for MPD and, as such, was responsible for the customs and policies that officers carry out.

203. At all relevant times, Defendant Couch was responsible for hiring, firing, training, supervision, and disciplinary issues with respect to the Manchester Police Department, including Defendants Scott-Sinclair and Jones.

204. Defendant Couch was responsible for ensuring that, when acting under color of law, officers of MPD did not violate the civil or Constitutional rights of individuals, including Plaintiff.

205. Before hiring Defendant Scott-Sinclair, Defendant Couch knew that Defendant Scott-Sinclair had disclosed on his employment application that he had previously been "discharged or disciplined" at prior employment for a "Use of Force incident at Fort Valley P.D. 2018."

206. Before hiring Defendant Scott-Sinclair, Defendant Couch knew that Defendant Scott-Sinclair had disclosed on his employment application that he had previously been a defendant in a law enforcement lawsuit that settled out of court.

207. Prior to hiring Defendant Scott-Sinclair, Defendant Couch knew that Defendant Scott-Sinclair would pose an extreme risk of violating the rights of citizens if hired as a law enforcement officer.

208.   At all relevant times, Defendant Couch knew that Defendant Scott-Sinclair had a history of intentionally violating the constitutional rights of others under color of law.

209.   At all relevant times, Defendant Couch knew that Defendant Scott-Sinclair had a history of unconstitutionally retaliating against individuals for speech or other protected activities while under color of law.

210.   At all relevant times, Defendant Couch knew that Defendant Scott-Sinclair had a history of using excessive force against individuals while under color of law.

211.   At all relevant times, Defendant Couch knew that Defendant Scott-Sinclair's employment as a law enforcement officer virtually guaranteed that Defendant Scott-Sinclair would violate the constitutional rights of citizens while operating under color of law.

212.   Prior to October 18, 2023, Defendant Couch was aware of previous incidents in which Defendant Scott-Sinclair acted under color of law—for the Manchester Police Department and elsewhere—and violated the constitutional rights of citizens.

213.   Despite this knowledge, Defendant Couch hired Defendant Scott-Sinclair as a law enforcement officer for the Manchester Police Department.

214.   Despite this knowledge, Defendant Couch retained Defendant Scott-Sinclair as a law enforcement officer for the Manchester Police Department.

215. Despite this knowledge, Defendant Couch, as Chief of Police, ratified Defendant Scott-Sinclair's constitutional deprivations under color of law.

216. By hiring Defendant Scott-Sinclair, Defendant Couch was deliberately indifferent to the First, Fourth, and other constitutional rights of the citizens of Manchester and the Manchester Police Department's jurisdiction.

217. By retaining Defendant Scott-Sinclair, Defendant Couch was deliberately indifferent to the First, Fourth, and other constitutional rights of the citizens of Manchester and the Manchester Police Department's jurisdiction.

218. By ratifying Defendant Scott-Sinclair, Defendant Couch was deliberately indifferent to the First, Fourth, and other constitutional rights of the citizens of Manchester and the Manchester Police Department's jurisdiction.

219. Defendant Couch's deliberate indifference with respect to the constitutional rights of the citizens of Manchester and the Manchester Police Department's jurisdiction resulted in constitutional deprivations under color of law, including those of Plaintiff on June 10, 2024.

220. Defendant Couch's deliberate indifference with respect to Plaintiff's constitutional rights caused the violation of Plaintiff constitutional rights.

221. Defendant Couch's deliberate indifference with respect to Plaintiff's constitutional rights caused Plaintiff damages.

222. At the time Defendant Couch hired Defendant Scott-Sinclair, the POST

system reflected a "File Review Required" notation associated with Defendant Scott-Sinclair's record.

223. Despite this knowledge, Defendant Couch hired Defendant Scott-Sinclair as an officer of MPD.

224. Defendant Couch had a duty to adequately screen candidates for employment as law enforcement officers to ensure that those hired did not pose a risk of violating the constitutional rights of individuals.

225. Defendant Couch failed to adequately screen Defendant Scott-Sinclair before hiring him, despite known indicators of a propensity for the use of excessive force.

226. Defendant Couch failed to adequately supervise Defendant Scott-Sinclair to ensure that he did not violate the constitutional rights of individuals, including Plaintiff.

227. Defendant Couch had a history, custom, and practice of allowing officers under his command, including those with known histories of use of force incidents, to violate the constitutional rights of individuals.

228. Defendant Couch's decision to hire Defendant Scott-Sinclair notwithstanding his documented history of prior use of force incidents, his POST probation, and a prior law enforcement lawsuit, was a proximate cause of the violation of Plaintiff's constitutional rights and her injuries and damages.

229. Defendant Couch's failure to adequately supervise Defendant Scott-Sinclair

was a proximate cause of the violation of Plaintiff's constitutional rights and her injuries and damages.

**WHEREFORE**, Plaintiff prays:

A.      That all special and general damages be awarded to Plaintiff in an amount shown by the evidence and determined by the enlightened conscience of the jury, including but not limited to compensatory damages for physical injuries, pain and suffering, medical expenses, emotional distress, and all other economic and non-economic damages proven at trial;

B.      That punitive damages be awarded against Defendants in their individual capacities in an amount to be determined by the enlightened conscience of the jury sufficient to punish them for their willful, wanton, reckless, and malicious conduct and to deter them and others from engaging in similar conduct in the future;

C.      That a trial by jury be had on all issues permitted;

D.      That attorneys' fees and expenses of litigation be awarded as authorized under 42 U.S.C. § 1988 and applicable law; and

E.      Such other and further equitable or monetary relief as the Court deems just and proper.


Dated: June 10, 2026

**Hall & Lampros, LLP**

*/s/ Andrew Lampros*
Andrew Lampros
Ga. Bar #432328
Christopher B. Hall
Ga. Bar # 318380
Joseph Quattlebaum
Ga. Bar # 319971

300 Galleria Pkwy SE Suite 300
Atlanta, GA 30339
T: (404) 876-8100
F: (404) 876-3477
alampros@hallandlampros.com
chall@hallandlampros.com
joseph@hallandlampros.com

*Attorneys for Plaintiff*